No. 2022-1630

# In the United States Court of Appeals for the Federal Circuit

HARRIS BRUMFIELD, TRUSTEE FOR ASCENT TRUST,
PLAINTIFF-APPELLANT

*v.*

IBG LLC; INTERACTIVE BROKERS LLC,
DEFENDANTS-APPELLEES

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, HONORABLE VIRGINIA M. KENDALL, PRESIDING, CASE NO. 1:10-CV-00715-VMK*

## BRIEF FOR DEFENDANTS-APPELLEES IBG LLC AND INTERACTIVE BROKERS LLC

MICHAEL S. SOMMER
*Wilson Sonsini Goodrich & Rosati, PC*
*1301 Avenue of the Americas*
*New York, NY 10019*

MICHAEL B. LEVIN
*Wilson Sonsini Goodrich & Rosati, PC*
*650 Page Mill Road*
*Palo Alto, CA 94304*

NAOYA SON
*Wilson Sonsini Goodrich & Rosati, PC*
*633 West Fifth Street*
*Los Angeles, CA 90071*

STEFFEN N. JOHNSON
KELSEY J. CURTIS
*Wilson Sonsini Goodrich & Rosati, PC*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 973-8000*
*sjohnson@wsgr.com*

NATALIE J. MORGAN
GRANVILLE C. KAUFMAN
*Wilson Sonsini Goodrich & Rosati, PC*
*12235 El Camino Real*
*San Diego, CA 92130*

*Counsel for Defendants-Appellees IBG LLC and Interactive Brokers LLC*

## PATENT CLAIMS AT ISSUE

**U.S. Patent No. 7,676,411**

1. A method of displaying market information relating to and facilitating trading of a commodity being traded on an electronic exchange, the method comprising:

   receiving, by a computing device, market information for a commodity from an electronic exchange, the market information comprising an inside market with a current highest bid price and a current lowest ask price;

   displaying, via the computing device, a bid display region comprising a plurality of graphical locations, each graphical location in the bid display region corresponding to a different price level of a plurality of price levels along a price axis;

   displaying, via the computing device, an ask display region comprising a plurality of graphical locations, each graphical location in the ask display region corresponding to a different price level of the plurality of price levels along the price axis;

   dynamically displaying, via the computing device, a first indicator representing quantity associated with at least one trade order to buy the commodity at the current highest bid price in a first graphical location of the plurality of graphical locations in the bid display region, the first graphical location in the bid display region corresponding to a price level associated with the current highest bid price;

   upon receipt of market information comprising a new highest bid price, moving the first indicator relative to the price axis to a second graphical location of the plurality of graphical locations in the bid display region, the second graphical location corresponding to a price level of the plurality of price levels associated with the new highest bid price, wherein the second graphical location is different from the first graphical location in the bid display region;

   dynamically displaying, via the computing device, a second indicator representing quantity associated with at least one trade order to sell the commodity at the current lowest ask price in a first graphical location of the plurality of graphical locations in the ask display region, the first graphical location in the ask display region corresponding to a price level associated with the current lowest ask price;

upon receipt of market information comprising a new lowest ask price, moving the second indicator relative to the price axis to a second graphical location of the plurality of graphical locations in the ask display region, the second graphical location corresponding to a price level of the plurality of price levels associated with the new lowest ask price, wherein the second graphical location is different from the first graphical location in the ask display region;

displaying, via the computing device, an order entry region comprising a plurality of graphical areas for receiving single action commands to set trade order prices and send trade orders, each graphical area corresponding to a different price level along the price axis;

and selecting a particular graphical area in the order entry region through a single action of the user input device to both set a price for the trade order and send the trade order having a default quantity to the electronic exchange.

**U.S. Patent No. 7,813,996**

1. A computer readable medium having program code recorded thereon for execution on a computer having a graphical user interface and a user input device, the program code causing a machine to perform the following method steps:

receiving market information for a commodity from an electronic exchange, the market information comprising an inside market with a current highest bid price and a current lowest ask price;

receiving an input from a user that designates a default quantity to be used for a plurality of trade orders;

dynamically displaying a first indicator in one of a plurality of locations in a bid display region, each location in the bid display region corresponding to a price level along a static price axis, the first indicator representing quantity associated with at least one order to buy the commodity at the current highest bid price;

dynamically displaying a second indicator in one of a plurality of locations in an ask display region, each location in the ask display region corresponding to a price level along the static price axis, the second indicator representing quantity associated with at least one order to sell the commodity at the current lowest ask price;

displaying the bid and ask display regions in relation to a plurality of price levels arranged along the static price axis such that when the inside market changes, the

price levels along the static price axis do not change positions and at least one of the first and second indicators moves in the bid or ask display regions relative to the static price axis;

displaying an order entry region aligned with the static price axis comprising a plurality of areas for receiving commands from the user input device to send trade orders, each area corresponding to a price level of the static price axis;

and receiving a plurality of commands from a user, each command sending a trade order to the electronic exchange, each trade order having an order quantity based on the default quantity without the user designating the default quantity between commands, wherein each command results from selecting a particular area in the order entry region corresponding to a desired price level as part of a single action of the user input device with a pointer of the user input device positioned over the particular area to both set an order price parameter for the trade order based on the desired price level and send the trade order to the electronic exchange.

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees hereby certifies the following:

1. The full names of every party represented by me are:

**IBG LLC; Interactive Brokers LLC**

2. The full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities:

**Not applicable.**

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:

**For IBG LLC, IBG Holdings, LLC and Interactive Brokers Group, Inc.; for Interactive Brokers LLC, IBG LLC.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

**Wilson Sonsini Goodrich & Rosati PC: Neil N. Desai; Abraham Delao; Christina Elizabeth Dashe; Matthew Alexander Blair; Matthew Robert Reed; Olivia M. Kim; Sarah Ann Siedlak**

**Lathrop Gage LLP: Danielle Twait Schmidt**

**Mandell Menkes LLC: Elizabeth A.F. Morris; John David Fitzpatrick; Steven P. Mandell**

**Baron Harris Healey: Natalie Anne Harris; Steven L Baron**

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeals:

**Not applicable.**

6. Any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees) is as follows:

**Not applicable.**

Dated: November 18, 2022

*/s/ Steffen N. Johnson*
STEFFEN N. JOHNSON
*Counsel for Defendants-Appellees*

# TABLE OF CONTENTS


**Page**

PATENT CLAIMS AT ISSUE ........ i

CERTIFICATE OF INTEREST ........ iv

TABLE OF CONTENTS ........ vi

TABLE OF AUTHORITIES ........ ix

STATEMENT OF RELATED CASES ........ xv

INTRODUCTION ........ 1

STATEMENT OF ISSUES ........ 4

STATEMENT OF THE CASE ........ 5

A. The patents ........ 5

B. IBG's product ........ 7

C. The district court's Section 101 ruling ........ 8

D. The district court's pre-trial ruling on TT's foreign damages theories ........ 10

E. The trial ........ 13

F. The post-trial proceedings ........ 15

SUMMARY OF ARGUMENT ........ 20

STANDARDS OF REVIEW ........ 23

ARGUMENT ........ 25

I. The district court correctly held that the '411 and '996 patents are patent-ineligible under Section 101. ........ 25

A. The district court correctly held that the '411 and '996 patents are directed to an abstract idea. ........ 26

1. TT's claims are directed to displaying information and "computerizing" basic and longstanding economic practices —abstract ideas under this Court's binding precedents....27

2. The '411 and '996 claims do not improve computer functioning. ....29

3. This Court's nonprecedential decisions either involved static price axes, decided Covered Business Method eligibility rather than Section 101 eligibility, or both....33

B. The district court correctly held that the '411 and '996 claim elements do not add an "inventive concept" under *Alice*'s second step....35

C. A host of this Court's other Section 101 decisions confirms that the district court correctly held TT's '411 and '996 patents patent-ineligible....36

D. Even if the '411 and '996 patents were valid and infringed, damages would be limited by the jury's previous damages determination....39

II. TT was fully allowed to pursue foreign damages theories at trial, the jury rejected them, and TT waived further consideration of the issue; but if the issue was preserved, TT's attempt to recover foreign damages is foreclosed by Section 271(a)'s plain text and *WesternGeco*. ....40

A. TT waived its *WesternGeco* foreign damages theory. ....41

B. TT was permitted to fully pursue its claim for foreign damages. ....42

C. TT cannot circumvent Section 271(a)'s territorial limitation. ....45

III. The district court did not abuse its discretion in denying TT's Rule 60(b) motion for a new trial based on frivolous allegations of fraud....51

A. Brumfield has changed arguments on appeal....51

B. The district court did not abuse its discretion in denying TT's Rule 60(b) motion based on TT's own failures to inquire and

investigate the facts and data it was provided in discovery long before trial. ....................................................................................53

C. The district court did not clearly err in finding that, for orders placed through BookTrader, the origination tool and order entry tool are the same. ......................................................................................57

CONCLUSION ..........................................................................................59

CERTIFICATE OF COMPLIANCE ..........................................................60

CERTIFICATE OF SERVICE ...................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ABS Glob., Inc. v. Inguran, LLC*,
2020 WL 2405380 (W.D. Wis. May 12, 2020)....................50

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012)....................25

*Alice Corp. v. CLS Bank International*,
573 U.S. 208 (2014)....................1, 4, 8-10, 25-29, 35, 38

*Anderson v. City of Bessemer City*,
470 U.S. 564 (1985)....................53

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016)....................38

*Bell v. McAdory*,
820 F.3d 880 (7th Cir. 2016)....................57

*Blair v. Graham Corr. Ctr.*,
1993 WL 331886 (7th Cir. Sept. 1, 1993)....................41

*Blameuser v. Hasenfang*,
345 F. App'x 184 (7th Cir. 2009)....................24, 45

*Brunner v. Jimmy John's LLC*,
2015 WL 13653079 (N.D. Ill. Dec. 11, 2015)....................42

*Cap Export, LLC v. Zinus, Inc.*,
996 F.3d 1332 (Fed. Cir. 2021)....................24

*Chrimar Holding Co., LLC v. ALE USA Inc.*,
732 F. App'x 876 (Fed. Cir. 2018)....................39-40

*Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*,
942 F.3d 1119 (Fed. Cir. 2019)....................24

*Connecticut Nat'l Bank v. Germain*,
503 U.S. 249 (1992)....................45

*Cook Cnty. v. Texas*,
37 F.4th 1335 (7th Cir. 2022) .......................................................... 24-25, 51

*Customedia Techs., LLC v. Dish Network Corp.*,
951 F.3d 1359 (Fed. Cir. 2020) ............................................................ 29-30

*Debra B. v. Kijakazi*,
2022 WL 1541335 (N.D. Ill. May 16, 2022)........................................... 41-42

*Deepsouth Packing Co. v. Laitram Corp.*,
406 U.S. 518 (1972)................................................................................ 48-49

*Downing v. Abbott Labs.*,
48 F.4th 793 (7th Cir. 2022) ....................................................................24, 45

*Elec. Power Grp., LLC v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ..............................................................29, 35

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020) ....................................................................28

*FairWarning IP, LLC v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................................................................35

*IBG LLC v. Trading Techs. Int'l, Inc.*,
2017 WL 4708078 (P.T.A.B. Oct. 17, 2017),
*aff'd*, *IBG IV*, 767 F. App'x ................................................................... 31-32

*IBG LLC v. Trading Techs. Int'l, Inc.*,
757 F. App'x 1004 (Fed. Cir. 2019)..........................................................8, 34

*IBM v. Zillow Group Inc.*,
50 F.4th 1371 (Fed. Cir. 2022) ................................ 1-2, 21, 23, 25-28, 36-38

*In re Killian*,
45 F.4th 1373 (Fed. Cir. 2022) ....................................................... 21, 35-38

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018) ..............................................................20, 27

*Mars, Inc. v. Coin Acceptors, Inc.*,
527 F.3d 1359 (Fed. Cir. 2008) ....................................................................50

*Mitutoyo Corp. v. Cent. Purchasing, LLC*,
499 F.3d 1284 (Fed. Cir. 2007) .....................................................................50

*Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*,
849 F.2d 264 (7th Cir. 1988) .........................................................................56

*Nordstrom Consulting, Inc. v. Innova Sys., Inc.*,
2022 WL 16744177 (N.D. Ill. Nov. 4, 2022) ................................................42

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir. 2015) .....................................................................28

*Paymaster Techs., Inc. v. United States*,
180 Fed. Appx942, Appx949 (Fed. Cir. 2006) .............................................50

*Pearson v. Target Corp.*,
893 F.3d 980 (7th Cir. 2018) .........................................................................57

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ................................................................... 37-38

*Plastronics Socket Partners, Ltd. v. Dong Weon Hwang*,
2019 WL 4392525 (E.D. Tex. June 11, 2019) ......................................... 49-50

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
2018 WL 4804685 (D. Del. Oct. 4, 2018) .....................................................50

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ..............................2, 12, 18-19, 23-24, 40, 50

*Promega Corp. v. Life Techs. Corp.*,
875 F.3d 651 (Fed. Cir. 2017) .......................................................................23

*Rite-Hite Corp. v. Kelly Co.*,
56 F.3d 1538 (Fed. Cir. 1995) .......................................................................50

*Rutledge v. United States*,
230 F.3d 1041 (7th Cir. 2000) ................................................................. 53-54

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) .....................................................................26

*Shakman v. Clerk of Cook Cnty.*,
994 F.3d 832 (7th Cir. 2021) .......................................................................55

*SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*,
396 F. Supp. 3d 323 (S.D.N.Y. 2019) ............................................................50

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ....................................................................29

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
675 F. App'x 1001 (Fed. Cir. 2017) ...........................................................8, 34

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.*,
595 F.3d 1340 (Fed. Cir. 2010) ....................................................................32

*Trading Techs. Int'l, Inc. v. IBG LLC*,
767 F. App'x 1006 (Fed. Cir. 2019) ......................................20-21, 27, 31-33

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1084 (Fed. Cir. 2019) ...................... 1, 4, 9, 20-21, 26-28, 30, 32-37

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1378 (Fed. Cir. 2019) .......................... 1, 4, 9, 21, 27, 30-31, 33, 35

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
728 F.3d 1309 (Fed. Cir. 2013) ............................................................ 32-33

*United States v. Biggs*,
491 F.3d 616 (7th Cir. 2007) .......................................................................53

*United States v. Dingwall*,
6 F.4th 744 (7th Cir. 2021) ..........................................................................24

*United States v. Farris*,
532 F.3d 615 (7th Cir. 2008) .......................................................................41

*United States v. Huskisson*,
926 F.3d 369 (7th Cir. 2019) .......................................................................57

*United States v. Murdock*,
491 F.3d 694 (7th Cir. 2007) .......................................................................42

*United States v. Thurman*,
889 F.3d 356 (7th Cir. 2018) .....................................................................53

*Universal Secure Registry LLC v. Apple Inc.*,
10 F.4th 1342 (Fed. Cir. 2021) .................................................................37

*W.H. Wall Fam. Holdings LLLP v. CeloNova Biosciences, Inc.*,
2020 WL 1644003 (W.D. Tex. Apr. 2, 2020) .............................................50

*Weisner v. Google LLC*,
51 F.4th 1073 (Fed. Cir. 2022) ............................................................ 37-38

*WesternGeco LLC v. ION Geophysical Corp.*,
138 S. Ct. 2129 (2018)..................................3-4, 11-12, 18-19, 21-22, 40-50

*WesternGeco LLC v. Ion Geophysical Corp.*,
791 F.3d 1340 (Fed. Cir. 2015) .................................................................49

*Yu v. Apple Inc.*,
1 F.4th 1040 (Fed. Cir. 2021) ...................................................................38

**Statutes:**

35 U.S.C. § 101 ........................................... 4, 8-9, 20, 23, 25-26, 28, 33-34, 36, 39

35 U.S.C. § 154(a)(1).....................................................................................47, 49

35 U.S.C. § 271 ........................................................................................ 46, 48-49

35 U.S.C. § 271(a) ................................................2-4, 12-13, 21-22, 40, 45-47, 49

35 U.S.C. § 271(f)............................................................................................ 47-49

35 U.S.C. § 271(f)(2) ........................................................3-4, 13, 22, 40, 46-48

35 U.S.C. § 284 ............................................................................................. 46-48

**Other Authorities:**

Fed. R. Civ. P. 52(a)(6).......................................................................................55

Fed. R. Civ. P. 59 .................................................................................. 15, 24-25

Fed. R. Civ. P. 60 ......................................................................................15, 24

Fed. R. Civ. P. 60(b) ....................24, 51, 53, 57

Fed. R. Civ. P. 60(b)(1)....................57

Fed. R. Civ. P. 60(b)(3)....................54

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, counsel for Defendant-Appellee IBG LLC and Interactive Brokers LLC states that no appeal from the same trial court action was previously before this or any other appellate court and that no cases pending in any court or agency will directly affect or be directly affected by this Court's decision in this appeal.

*/s/ Steffen N. Johnson*
Counsel for Defendants-Appellees

## INTRODUCTION

This 13-year-old lawsuit concerns four (now-expired) software patents held by Trading Technologies International, Inc. ("TT"), all of which claim methods of placing trades on electronic exchanges.[1] The first question on appeal—which concerns the '411 and '996 patents—is whether the subject matter was patent-eligible. The second question—which concerns the '132 and '304 patents—turns on whether TT was improperly constrained in seeking foreign damages. The third question is whether the district court wrongly denied a retrial based on frivolous claims of fraud.

***Patent eligibility.*** On the first question, the district court's decision invalidating the claims of the '411 and '996 patents is compelled by *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014), and a host of this Court's precedents—including two binding decisions involving related TT patents that, remarkably, TT *never cites*. *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019) (*IBG II*), *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378 (Fed. Cir. 2019) (*IBG III*). This Court has "repeatedly" invalidated "claims 'directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner.'" *IBM v. Zillow Group Inc.*, 50 F.4th 1371, 1378 (Fed. Cir. 2022) (citation

[1] After trial, Plaintiff-Appellant Brumfield, formerly TT's majority owner, sold TT but retained the asserted patents and transferred them to his trust. For consistency with the decision below, we refer to Plaintiff-Appellant as TT.

omitted). That principle squarely applies here. Ignoring binding precedent, TT's only answer is to cite two non-precedential cases involving distinct claims and statutes. But on-point precedent prevails over off-point non-precedent.

***Foreign Damages.*** The second question arises from a month-long trial where the district court allowed TT to present two different theories for recovering worldwide damages under 35 U.S.C. § 271(a). Under the first theory, TT argued that if foreign users downloaded the accused software from a U.S. server, that amounted to "making" the patented software "within the United States." Under the second theory, TT argued that if foreign users entered into a customer agreement with IBG LLC, a U.S. entity, that was a domestic "sale." Appx19. TT thus presented extensive evidence concerning overseas activity: its royalty base included all foreign users of the accused software, and its royalty rate was based on their use. But the jury, while finding that IBG had infringed, awarded damages of the precise number ($6,610,985) that IBG proposed if the jury limited the royalty base to U.S.-based users and applied a $0.10 per-trade royalty rate. The jury thus rejected TT's attempt to recover foreign damages.

Nevertheless, TT now says the district court erred in holding that *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348 (Fed. Cir. 2013), barred it from presenting yet a *third* foreign damages theory under § 271(a)—one producing identical "worldwide" damages. According to TT, *Power Integrations*

was silently overruled by *WesternGeco LLC v. ION Geophysical Corp*., 138 S. Ct. 2129 (2018). But while TT attempts to recast its *WesternGeco* theory as involving simply the "foreseeable, but for" effects of domestic infringement, that theory is in substance no different from its first two theories—which the jury rejected, leaving TT nothing to appeal.

Further, TT's position that it was wrongly limited to its "making" and "sale" theories is foreclosed by its waivers below—before, during, and after trial. As the district court explained *before* trial, TT's damages expert, Catharine Lawton, "admitted at her deposition" that TT could not recover for use of its patented software "'to the extent [a user's] physical location is outside the United States.'" Appx19-20 (citation omitted). On cross-examination *at* trial, Lawton again conceded that TT could not recover for "use" of its software by "a customer outside of the United States." Appx103097; Appx86033. And as the district court stated *after* trial, TT "waived" its *WesternGeco* theory by "abandon[ing]" it in its post-trial briefing. Appx41 n.3; Appx44 n.5.

Finally, even if TT could overcome the foregoing difficulties, its *WesternGeco* theory would run headlong into the Patent Act's plain text. Section 271(a) contains an explicit territorial limitation—it bars making, using, offering to sell, and selling patented inventions "within the United States." The infringement provision at issue in *WesternGeco* (§ 271(f)(2)), by contrast, contained no such limitation; it

prohibited "the act of *exporting components from* the United States." 138 S. Ct. at 2138 (emphasis added). TT does not invoke § 271(f)(2), and reading *WesternGeco* to authorize recovery of damages for use outside the United States under § 271(a) would rewrite the statute.

***Fraud Allegations.*** Finally, in a last-ditch effort to recover damages that the jury concluded TT did not deserve, TT demands a new trial on damages based on vague and shifting allegations of "fraud." But the district court's denial of a retrial may be reversed only if "no reasonable person could agree with" it, and TT's argument on this score is nothing short of frivolous.

## STATEMENT OF ISSUES

1. TT's '411 and '996 patents recite methods of using software run on generic computers to automate a longstanding business practice, traditionally done by hand, by gathering trading information and displaying the results on a graphical user interface. The first issue is whether those patents claim ineligible subject matter under 35 U.S.C. § 101, *Alice*, *IBG II*, *IBG III*, and this Court's other precedential decisions.

2. Whether TT was in any way constrained in presenting its foreign damages claims at trial, and, if the issue was preserved, whether 35 U.S.C. § 271(a), which bars making, using, offering to sell, or selling a patented invention "within the United States," prevents TT from recovering damages for foreign use.

3. Whether no reasonable person could agree with the district court's decision to deny a new trial based on TT's frivolous eleventh-hour allegations of fraud, where TT indisputably had the relevant evidence "well before trial ("Appx30); TT's "own failure" caused it to fail to examine that evidence before trial (Appx37); and the evidence ultimately was immaterial to the outcome.

## STATEMENT OF THE CASE

### A. The patents

This case involves four now-expired TT software patents. The '411 and '996 patents were invalidated at summary judgment, and the '132 and '304 patents went to trial. These patents belong to the same family, share a specification, and are "directed to the electronic trading of commodities." Appx63631-52; Appx63656-74.[2] They recite "[a] method and system for reducing the time it takes for a trader to place a trade when electronically trading on an exchange." *Id.* Specifically, the patents claim a graphical user interface (GUI) that "display[s] market depth on a vertical or horizontal plane, which fluctuates logically up or down, left or right across the plane as the market price fluctuates." *Id.* This GUI "can be implemented on any existing or future terminal or device," and "[t]he physical mapping of [the] information to a screen grid can be done by any technique known to those skilled in the art." *Id.*

[2] The '132 and '304 patents' validity is not at issue. Cir. Ct. Dkt. 28 (dismissing IBG's cross-appeal).

TT's GUI displays bid and ask columns and inside market indicators (area 120) that move relative to a price axis, as shown here:

FIG. 3




Appx67414. Importantly, the '411 and '996 patents' claims encompass GUIs that are "non-static": they display trade orders along price axes that automatically move or re-center (Appx70797; Appx70800; Appx70802), unlike the '132 and '304 patents, which claim "static" price axes that move only in response to a manual re-centering or re-positioning command (Appx5 (citing Appx70794)).

Of course, long before electronic trading, exchanges were physical places where people negotiated trades. Some exchanges, like the New York Stock Exchange ("NYSE"), employed "specialists" (Appx70816) who maintained physical

books with pre-printed vertical price columns, and used them to plot, by hand, bid and ask quantities along the vertical price column (Appx8 (citing Appx82980)), updating the list as orders were placed (Appx82980).

FIGURE 4-2. A page in the specialist's book.




Appx82980. Traders used similar pen-and-paper methods at the Tokyo Stock Exchange ("TSE"), and eventually both the NYSE and TSE books were converted to electronic versions. Appx8 (citing Appx82980-86; Appx82989-92).

### B. IBG's product

The accused IBG trading software is the "BookTrader" tool, which is part of the "Trader Workstation platform" ("TWS"). Appx63419-20; Appx63427-28. TWS BookTrader, one of 38 trading tools in TWS (Appx103651), is available to users in Europe, Asia, and the Americas (Appx88457). To obtain and use a copy of TWS BookTrader, one must download the entire TWS software platform through

links on IBG's website. Appx88457. To place an order via TWS BookTrader, one must use a mouse or another input device. Appx88457.

The operative complaint alleged that TWS BookTrader infringed all four asserted patents then at issue. Appx63419-37. TT also accused IBG's WebTrader software of infringing, but alleged that WebTrader infringed only the '411 and '996 patents. Appx63430-37.

### C. The district court's Section 101 ruling

After years of discovery, IBG sought summary judgment, contending that the '411 and '996 patents were patent-ineligible under 35 U.S.C. § 101. Appx67392. Citing *Alice* and this Court's more recent precedential decisions involving similar TT patents, IBG maintained that these patents were "directed to an unpatentable abstract idea" (Appx67398-401) and recited no "inventive concept" such as improved computer functioning—only use of generic computers to automate the conventional steps of a fundamental economic practice. Appx67401-06.

In response, TT invoked two unpublished opinions, one involving different (though related) patents (*IBG LLC v. Trading Techs. Int'l, Inc.*, 757 F. App'x 1004 (Fed. Cir. 2019) (*IBG* I)), and one involving "covered business method" (CBM) review (*Trading Techs. Int'l, Inc. v. CQG, Inc.*, 675 F. App'x 1001 (Fed. Cir. 2017)). Although these nonprecedential decisions contained no § 101 ruling on either the '411 or '996 patent, TT cited them in arguing that those patents "improve[d] the

functioning of the computer" (Appx70771-76) by "provid[ing] better speed, accuracy, and usability than prior art GUI tools" and avoided the "risk of [the trader] missing her price due to the" price axis moving (Appx70774).

The district court granted IBG summary judgment. Appx12-16. At *Alice* step one, the court held that the '411 and '996 patents were "directed to the abstract idea of placing orders on an electronic exchange." Appx14. The "mere process of gathering information and displaying the results … is unpatentable" (Appx12), the court explained, and "providing market information in the specific configuration recited by the patents … 'improv[ed] the trader, not the functioning of the computer.'" Appx12 (quoting *IBG III*, 921 F.3d at 1383). The court was "hesitant to rely" on TT's non-precedential cases "to support a finding of § 101 eligibility particularly in light of subsequent Federal Circuit decisions finding related TT patents ineligible under § 101." Appx14. Nor was the court "inclined to extend the reasoning of" the other "nonprecedential opinion, to related patents that do not share the same claim limitations (a static price axis)." Appx13. As the court noted, "TT does not explain[] how the [']411 and [']996 Patents, which include price axes that automatically move, solve the missing-the-price problem." Appx13.

At *Alice* step two, the district court held that the claim elements did not, "individually [or] as an ordered combination, recite an innovative concept." Appx14. Rather, they recited the "mere receipt of information," along with "[d]isplaying and

plotting information available to all." Appx15 (citation omitted). Thus, "the invention merely claim[ed] a rearrangement of market information known to be displayed in a different format," which was "not innovative." Appx15 (citations omitted).

### D. The district court's pre-trial ruling on TT's foreign damages theories

IBG also filed a *Daubert* motion to exclude portions of the opinion of TT's damages expert, Catharine Lawton. Appx85127-50. Two aspects of Lawton's testimony are relevant here.

First, Lawton's expert report opined that "TT's damages … should be based on a reasonable royalty," and she acknowledged that the royalty would be the same "assuming that infringement [was] found for one or more of the Patents-in-Suit," which then included all four patents. Appx94112. As she put it: "the reasonable royalty would be the same whether infringement is found for one or more than one of the Patents-in-Suit. For example, if the '411 Patent and/or '996 Patent were found to be invalid and/or not infringed, the royalty base and royalty rate would be" the same, minus the number of users of IBG's WebTrader product. Appx94113.

Second, Lawton concluded that the royalty rate should be "a $50 per user per month minimum." Appx94530; Appx94534. As to the royalty base, Lawton opined that it should include any user of any trading tool within TWS that made any trade within any given month. Appx94112-13; Appx94534-36. Lawton's damages

calculation thus included "the monthly counts of [TWS] users across the geographies"—i.e., both "U.S. residents" and "Non-U.S. residents." Appx94535.

Lawton offered four theories to justify including users worldwide in her royalty base: "(1) 'making' a copy of BookTrader via server located in the US" (the "making" theory); "(2) 'use' of BookTrader in the US" (the "U.S. use" theory); "(3) 'sale or offer to sell' BookTrader by a user's entry into a customer agreement" (the "sale" theory); and "(4) 'making' BookTrader in the US with foreign damages" (the "*WesternGeco* theory"). Appx85143 (citations omitted); *see* Appx94542. Lawton described the *WesternGeco* theory as based on "IBG mak[ing] BookTrader in the United States, and the[n] BookTrader [being] replicated and then distributed throughout the world from the United States." Appx94550.

Three of these theories, according to Lawton, allowed capturing TWS users worldwide. The only theory that did not capture the whole world was the U.S. use theory. And as Lawton "admitted at her deposition," before the *Daubert* ruling, TT could not recover for "use" of BookTrader "to the extent [a user's] physical location is outside the United States." Appx19-20; Appx86033.

IBG moved to exclude Lawton's "opinion on foreign damages." Appx85134-35; Appx85143. As IBG explained, her "making" theory included all foreign users in her royalty base despite evidence that many foreign users download TWS from non-U.S. servers. Appx85143-44. Her "sale" theory fell short because TT lacked

evidence that all foreign users actually sign an IBG Agreement. Appx85144-46. And finally, IBG maintained that her *WesternGeco* theory "should be excluded as premised on an incorrect statement of the law." Appx85146-48.[3]

The district court largely sided with TT, allowing Lawton to present a royalty base including *all* foreign users. Appx18-20. Specifically, Lawton could present her "making" and "sale" theories—which respectively postulated that, if users located overseas downloaded the accused software from a U.S. server, that amounted to domestic "making," and if users located overseas entered into a customer agreement with IBG LLC, a U.S. entity, that amounted to a domestic "sale," under § 271(a). Appx19.

There was just one exception—the district court barred Lawton's *WesternGeco* theory, which sought to include foreign use "premised on a theory of foreseeable foreign consequences of infringement." Appx19. As the court explained, under this Court's precedents, "a patentee may not recover damages for worldwide sales of the patented invention on the theory that 'those foreign sales were the direct, foreseeable result of [the infringer's] domestic infringement.'" *Id*. (quoting *Power Integrations*, 711 F.3d at 1371). The court rejected TT's argument that *WesternGeco* silently overruled *Power Integrations*, explaining that *WesternGeco* involved

[3] IBG also explained that, as Lawton had acknowledged, her U.S. use theory did not reach foreign users. Appx85144.

§ 271(f)(2), which TT did not invoke, and was "'of limited value'" in cases involving § 271(a). Appx19 (citation omitted).

### E. The trial

At trial, Lawton testified about both domestic and foreign damages, advancing the same proposed royalty base and rate described in her report. As to the base, Lawton included not only domestic users (the U.S. use theory), but *all* foreign users. Under her "making" theory, Lawton maintained that IBG was responsible for damages whenever any customer, anywhere in the world, downloaded a copy of TWS, as IBG's U.S. servers would then "make" TWS. Appx100890-96; Appx101026; Appx10164-65. Under her "sale" theory, Lawton maintained that every IBG customer—foreign or domestic—that downloaded TWS effected a sale via a customer agreement with IBG LLC, a U.S. entity. Appx100897-98; *see also* Appx99879 (testimony from another TT expert about IBG's customer agreement). Concerning her royalty rate, Lawton relied on three license agreements to arrive at a royalty of $50 per user-month for anyone who used TWS anywhere at any point during the month. Appx100875-76; Appx100865.

Lawton thus included foreign users in her royalty base and based her royalty rate on user-months premised on TWS's *use*. And yet, consistent with her deposition (Appx86033), she candidly admitted again, on cross-examination, that TT could not recover for foreign use:

> Q. Let's make it clear. You agreed with me last week that a customer outside of the United States, for use, actual using BookTrader, TT can't recover for them; correct?
>
> A. For the customer's use, yes.

Appx103097.

IB's damages expert, Brett Reed, took a different approach. He maintained that if the jury found infringement, damages should be based solely on a royalty rate of between $0.02 and $0.10 per trade—the precise rates that TT had agreed to in settlement and licensing agreements with other companies that TT had accused of infringing the same patents. Appx102577-80. As Reed explained, the royalty rate should be at most $0.10 per trade, as TT had advertised that rate as its "going rate" as of the date of the hypothetical negotiation with IBG. Appx102527-28. Reed also noted that in TT's many settlements with other companies, it was paid at most $0.10 per trade—*never* $50 per-month. Appx102463-69.

Because the district court allowed TT to include foreign users in its royalty base, Reed calculated damages numbers for the three groups identified by Lawton: "U.S. residents," "All US CCP," which includes the U.S. but also "others outside the United States" trading in Europe, and finally "Worldwide," which includes the first two groups and any others worldwide. Appx102578. Using the $0.10 per-trade royalty rate, this produced three possible damages awards:

| U.S. Residents | All US CCP | Worldwide |
|---|---|---|
| $6,610,985 | $15,392,536 | $19,593,338 |

Appx102579.

The jury found infringement, but rejected both TT's royalty rate of $50 per user-month and its royalty base of user-months. Instead, the jury adopted the $0.10 per-trade royalty rate that Reed advocated, and that TT itself had advertised. The jury also limited the royalty base to U.S. users, producing damages of $6,610,985. Appx93222-27. TT later acknowledged that IB's "damages theory" of "multiplying an asserted reasonable royalty (e.g., $.10 a [trade] for futures) times the number of trades" "prevailed" (Appx103483); "the jury adopted" the "foundation of IB's damages case"—including "IB's entire damages base" (Appx93243; Appx103483).

### F. The post-trial proceedings

After trial, TT sought a new trial under Federal Rules of Civil Procedure 59 and 60. Appx93235. Two aspects of that motion are relevant here.

First, TT's opening brief alleged that IBG had "knowingly withheld information directly relevant" to how trades were tracked and counted on the TWS platform (Appx93237) by "not mak[ing] TT aware of the HKF [Hot Key Framework] until near the very end of trial." Appx93233. TT also complained that, "for the first time" at trial, IBG in-house coding witness Dennis Stetsenko revealed that "the HKF allowed IB to track orders 'attributable to trading tools, not order entry tools.'"

Appx93239. Finally, TT accused IBG's witnesses of lying. Appx93241. The supporting declaration of Harris Brumfield, then TT's majority owner, claimed he could "back into how IB [was] tracking orders/trades," describing a dizzying system of "parent," "children," and "grandchildren" trading tools. Appx94665.

IBG responded that it had produced the HKF code 1.5 years *before* trial, and that Stetsenko had referred to it in his deposition. Appx97788.[4] IBG denied any discovery misconduct (Appx97788-92) or false testimony (Appx97792-96). IBG also submitted declarations from Stetsenko and an outside coding expert, Benjamin Goldberg. Goldberg "reviewed the BookTrader Hot Key Code and general Hot Key Code," explaining that it had been "produced prior to the close of expert discovery" with "nothing missing," and that "the code for tagging a BookTrader order reliably tags orders from BookTrader with a BookTrader tag." Appx98653; Appx98655. Moreover, Goldberg was "able to follow the BookTrader code (including the relevant Hot Key Code) that creates an order and transmits it" and "to see where the

[4] At trial, TT extensively questioned Stetsenko about how IBG tracked trades. After asking him about the "mechanism to track … commissions attributable to Order Entry tools," Stetsenko corrected TT, explaining that it should be commissions "[a]ttributable to trading tools, not Order Entry tools," and that not all trading tools "allow you to enter orders." Appx101776-77. Stensenko also testified that IBG used HKF to "connect user action, mouse or key stroke, with a tool" so that IBG can "track orders placed from a specific tool." Appx101719. That testimony was based on evidence produced to TT more than a year earlier.

originator tag is properly (and consistently) being assigned to BookTrader." Appx98653-54; Appx98661.

Stetsenko's declaration confirmed that he had testified accurately. Appx98643-45. It also explained that Brumfield incorrectly assumed that there were "non-order entry trading tools." Appx98646. As Stetsenko observed, "all of the tools [that Brumfield] says are 'non-order entry' tools are used by users to place orders. [Brumfield's] confusion stems from his lack of understanding regarding the order entry tools within TWS, and how they work." Appx98646. Stetsenko then explained that the "order entry tools in TWS can largely be categorized into two categories: (a) those that are self-contained (i.e., they have their own order entry mechanism); and (b) those that are intended for order placement but do not have their own graphical order entry mechanism and thus use another IB tool for that purpose." Appx98646. Importantly, "[f]or the first category, the mechanism of order entry is straightforward; a user simply clicks to place an order or uses the keyboard to input an order from that tool. BookTrader belongs to this first category." Appx98646. "[B]ecause BookTrader belongs to the first category" and is "self-contained," how IBG tracks tools that lack their own order entry mechanism "is completely irrelevant." Appx98647.

On reply, TT dramatically shifted its "fraud" theory, and Brumfield submitted a second (contradictory) declaration. TT's reply barely mentioned the HKF.

Instead, it newly argued that IBG had "always led Plaintiff to believe that it was tracking orders and trades in TWS by what tools the orders are submitted from," when in reality IBG was tracking orders based on "the order originators." Appx103487. Brumfield's new declaration disclaimed his first hypothesis for how IBG was tracking orders. Appx103652-53.

Second, TT's opening post-trial brief asserted its *WesternGeco* theory. Appx93245-46. IBG responded that "*WesternGeco* d[id] not entitle TT to a new trial on foreign damages" because "*Power Integrations* [] is still binding"—a point on which "virtually all district courts" agree. Appx97800 (citations omitted). On reply, TT never mentioned its *WesternGeco* theory. Appx103483-93.

The district court denied TT's motion for a new trial. As to TT's argument that IBG committed discovery misconduct by withholding the HKF code, the court explained that TT's own coding expert "admits that prior to trial, TT knew of and understood 'the term "hotkey" … to refer to the user-definable mapping of actions (such as to buy or sell) onto keystrokes or mouse clicks'"—which was "entirely consistent" with Stetsenko's trial testimony. Appx35.[5] The court further found that "[a]ll of the materials Brumfield relied on" to perform his post-trial analysis "were

[5] The district court also noted that "[a]t best, there is conflicting expert testimony regarding whether IB produced the hot key source code, which is insufficient to satisfy the clear and convincing evidence standard for a new trial." Appx38.

produced prior to trial and admitted into evidence at trial." Appx36. "It is unclear," the court thus explained, "why this investigation could not have been performed earlier" and used to "cross[] IB's witnesses." Appx36. In sum, "TT fail[ed] to demonstrate by clear and convincing evidence that IB's failure to produce the hot key code, as opposed to its own failure to ferret out information during discovery, prevented it from fully and fairly litigating its case." Appx37. The district court also rejected TT's argument that IB's witnesses had testified falsely, finding no evidence that IBG "does not track BookTrader orders based on order entry tool," or "that IB's misconduct, as opposed to [TT's] own actions, prejudiced TT." Appx38-41.

As to TT's *WesternGeco* theory, the district court found that TT "abandon[ed] … its argument regarding foreign damages [by not addressing it] in its reply brief," and thus "waived" it. Appx41 n.3. Nevertheless, "[i]n an effort to be thorough" (Appx41 n.3), the court evaluated TT's theory on the merits. The court explained that "[s]everal courts to consider the issue have agreed that *Power Integrations* and its progeny remain binding precedent even after *WesternGeco*." Appx45 (collecting cases). The court thus held that its previous ruling "remain[ed] sound." Appx45.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that the '411 and '996 claims are directed to an abstract idea, do not provide an innovative concept, and thus are patent-ineligible under § 101. The asserted claims are directed to "[t]he mere process of gathering information and displaying the results" (Appx12), and to automating basic economic practices that have long been done "by hand" (Appx8). In addressing other TT patents, this Court has repeatedly held that "'the collection, organization, and display of two sets of information on a generic display device is abstract.'" *IBG II*, 921 F.3d at 1092-93 (quoting *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1345 (Fed. Cir. 2018)); *see also id*. at 1084-85; *Trading Techs. Int'l, Inc. v. IBG LLC*, 767 F. App'x 1006, 1007 (Fed. Cir. 2019) (*IBG IV*). Moreover, this Court has repeatedly held—including in binding decisions involving TT's own patents—that "placing an order based on displayed market information is a fundamental economic practice." *IBG II*, 921 F.3d at 1092-93. Yet TT never even mentions this Court's precedential opinions involving similar TT patents, instead relying on non-precedential opinions that either involved claims limited to static price axes, did not address § 101 eligibility, or both.

TT's claims do not "improve the functioning of the computer" itself. Br. 46. As the district court held, the '411 and '996 patents' claims "include price axes that automatically move," so they do not "solve the missing-the-price problem." Appx13

(citation omitted). Moreover, in assessing similar TT patents from the same family, this Court has twice rejected the same arguments about speed and visualization improvements that TT raises here. *See IBG II*, 921 F.3d at 1094-95; *IBG IV*, 767 F. App'x at 1007-08 (citing *IBG II* and *IBG III*).

The district court's step two holding was equally correct: "claims that merely use a computer to implement well-known business or economic practices are not [patent-eligible]," and "[d]isplaying and plotting information available to all" on a generic computer "is not innovative." Appx9; Appx15. In short, the district court correctly applied this Court's decisions "repeatedly" invalidating "claims 'directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner.'" *Zillow*, 50 F.4th at 1378 (quoting *In re Killian*, 45 F.4th 1373, 1380 (Fed. Cir. 2022)).

**II.** The district court allowed TT to advance two § 271(a) foreign damages theories at trial—its "making" and "sale" theories. According to these theories, when foreign users downloaded the accused software and executed agreements to buy it, such transactions were domestic infringement—"making" or "selling" the accused software in the United States. Appx18-19. The jury rejected both theories.

The sole foreign damages theory that TT ostensibly was not allowed to press was its so-called *WesternGeco* theory—that IBG was "making" BookTrader in the

United States, causing "foreseeable foreign consequences." Appx19, Appx94550. But that theory is not meaningfully different from the two theories that TT did present—which posited that IBG was making TWS domestically and then selling it to foreign users from its domestic servers. Appx19. All three theories rest on the same primary conduct, and TT identifies no evidence that the district court's *WesternGeco* ruling kept it from offering. In short, TT is complaining that the jury rejected its claims to include foreign users in its damages award, not that it was barred from presenting evidence—which is an improper effort to get a second bite at the apple.

Beyond this fundamental difficulty, TT faces insurmountable problems arising from both its waivers below and the plain text of § 271(a). Both before and after trial, TT's damages expert conceded that TT may not recover for the "use" of Booktrader by "a customer outside of the United States." Appx103097; *see* Appx19-20. If that were not enough (it is), TT "waived" its *WesternGeco* argument by "abandon[ing]" it after trial. Appx41 n.3; Appx44 n.5.

Finally, even if TT's argument were somehow preserved, it could not overcome the plain text of § 271(a), which bars making, using, selling, or offering to sell a patented invention "within the United States." By contrast, § 271(f)(2)—the infringement provision at issue in *WesternGeco*—bars "the act of exporting," making it reasonable to conclude that Congress authorized "recover[y] for lost foreign profits." 138 S. Ct. at 2138, 2139. And since *WesternGeco* is TT's only alleged basis

for reversal, this Court's decision in *Power Integrations* controls. As the Court there held, it is "axiomatic" that the U.S. patent laws "do not … provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all," and a patentee may not "recover damages for … worldwide sales of the patented invention because those foreign sales were the direct, foreseeable result of [the defendant's] domestic infringement." 711 F.3d at 1371.

**III.** The district court did not abuse its discretion in denying TT's far-fetched motion for a new trial based on vague and shifting allegations of "fraud." Neither "critical error[]" that TT asserts was error, much less a decision that "no reasonable person could agree with." The district court cast TT's arguments in the best possible light to TT, carefully explaining that IBG produced the relevant evidence well before trial, that TT failed to examine it, and that, regardless, there was no prejudice. To suggest that "no reasonable person could agree with" that decision is frivolous.

## STANDARDS OF REVIEW

"A district court's determination of patent eligibility under § 101 is a question of law" reviewed "*de novo*." *Zillow*, 50 F.4th at 1376-77.

"[The Federal Circuit] review[s] [a] district court's waiver finding using the same standard applied by the regional circuit." *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 661 (Fed. Cir. 2017). "The Seventh Circuit reviews the ultimate legal conclusion of waiver *de novo* and predicate factual findings for clear error." *Id*.

This Court reviews the admissibility of evidence, including expert testimony, under regional circuit precedent. *Power Integrations*, 711 F.3d at 1356. In the Seventh Circuit, "decisions regarding the admission and exclusion of evidence are peculiarly within the competence of the district court" and "are reviewed for abuse of discretion." *Downing v. Abbott Labs.*, 48 F.4th 793, 804 (7th Cir. 2022) (citation omitted). Such decisions "[may] be overturned only if no reasonable person would agree with the trial court's ruling" and "the error must have 'likely affected the outcome.'" *Id.* (citations omitted). Where evidence is excluded based on a "determination" on "a matter of law," review is *de novo*. *United States v. Dingwall*, 6 F.4th 744, 750 (7th Cir. 2021). But "[e]ven an erroneous evidentiary ruling can be deemed harmless if the record indicates that the same judgment would have been rendered regardless." *Blameuser v. Hasenfang*, 345 F. App'x 184, 186 (7th Cir. 2009).

Rulings on Rule 59 and Rule 60 motions are reviewed under regional circuit law. *Cap Export, LLC v. Zinus, Inc.*, 996 F.3d 1332, 1338 (Fed. Cir. 2021) (Rule 60); *Columbia Sportswear N. Am., Inc. v. Seirus Innovative Accessories, Inc.*, 942 F.3d 1119, 1124 (Fed. Cir. 2019) (Rule 59). Under Seventh Circuit precedent, Rule 60(b) rulings are reviewed under an "'extremely deferential abuse of discretion standard' that is met 'only when no reasonable person could agree with the decision to deny relief.'" *Cook Cnty. v. Texas*, 37 F.4th 1335, 1344 (7th Cir. 2022) (citation

omitted). The Seventh Circuit also "review[s] [Rule 59] ruling[s] for an abuse of discretion." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012).

## ARGUMENT

### I. The district court correctly held that the '411 and '996 patents are patent-ineligible under Section 101.

Section 101 "defines the subject matter eligible for patent protection." *Alice*, 573 U.S. at 216. But it "contains an important implicit exception: … abstract ideas are not patentable." *Id.*

To determine whether a patent claims non-eligible subject matter, courts ask whether the claim as a whole is "directed to" an abstract idea, and if so whether a specific claim step or combination of steps adds an "inventive concept." *Id.* at 217-18. As the district court recognized, TT's patent claims are directed to "[t]he mere process of gathering information and displaying the results" (Appx12), and to automating fundamental, longstanding economic practices that could be done "by hand" (Appx8)—abstract ideas. It also recognized that "claims that merely use a computer to implement well-known business or economic practices are not [patent-eligible]," and that "[d]isplaying and plotting information available to all" on a generic computer "is not innovative." Appx9; Appx15.

That conclusion is compelled by *Alice*, by this Court's binding precedential decisions involving similar *TT* patents, and by a host of the Court's other precedential decisions. This Court has "repeatedly held" that "claims 'directed to collection

of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner' [are] abstract." *Zillow*, 50 F.4th at 1378 (citation omitted). These binding Section 101 decisions—and not TT's nonprecedential rulings—govern here.

**A. The district court correctly held that the '411 and '996 patents are directed to an abstract idea.**

Under *Alice* step one, the question is "whether the claims at issue are directed to" an "abstract idea." *IBG II*, 921 F.3d at 1092. To determine what claims are "directed to," courts consider their "focus"—their "character as a whole." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (citation omitted). The '411 and '996 patents claim, respectively, "[a] method of displaying market information relating to and facilitating trading of a commodity being traded on an electronic exchange," and "a graphical user interface [(GUI)] and a user input device" that facilitate electronic trading. Appx6-8. As the district court explained, these claims are directed to "placing orders on an electronic exchange" (Appx14) via GUIs that "gather[] information and display[] the results" by plotting market information along a price axis (Appx12). That focus is an abstract idea that does not improve computer functioning.

#### 1. TT's claims are directed to displaying information and "computerizing" basic and longstanding economic practices —abstract ideas under this Court's binding precedents.

TT's claims fail *Alice*'s first step for two independent reasons. First, they are "'directed to [the] collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner'"—an "abstract" idea. *Zillow*, 50 F.4th at 1378 (citation omitted). Second, they recite only computerizing a longstanding, fundamental economic practice that can be done with "[p]en-and-paper." Appx8.

The district court correctly held that "[t]he mere process of gathering information and displaying the results … is unpatentable." Appx12 (citation omitted). This Court has repeatedly held—addressing other TT patent claims directed to "graphing (or displaying) bids and offers to assist a trader to make an order"—that "[a]s a general rule, 'the collection, organization, and display of two sets of information on a generic display device is abstract.'" *IBG II*, 921 F.3d at 1092-93 (quoting *AOL*, 896 F.3d at 1345); *see also id.* at 1084-85; *IBG IV*, 767 F. App'x at 1007 (relying entirely on the two previous precedential decisions, *IBG II* and *IBG III*). Although not every claim held patent-ineligible in these cases was from the same patent family as those at issue here, at least two were, and those two claims—like the '411 and '996 claims—both covered non-static prices axes. *Id.* Under these decisions, "a purportedly new arrangement of generic information that assists traders in

processing information more quickly … [is] directed to the abstract idea of graphing bids and offers to assist a trader to make an order." *IBG II*, 921 F.3d at 1093. That alone answers the step-one inquiry.

But there is more. Buying commodities through an exchange based on market information is "similar to other 'fundamental economic concepts'" that can be done with pen and paper and have been "found to be abstract ideas by the Supreme Court and this court." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (collecting cases). As this Court has held—again, in binding Section 101 decisions involving TT patents—"placing an order based on displayed market information is a fundamental economic practice." *IBG II*, 921 F.3d at 1092-93. Here, traders previously performed TT's method "by hand," in specialists' books used at the NYSE and TSE. Appx67427-28; Appx82980-92. Yet a patent that "automates pen and paper methodologies to conserve human resources and minimize errors is a quintessential do it on a computer patent directed to an abstract idea." *Zillow*, 50 F.4th at 1382 (cleaned up); *see Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (citation omitted) (processes previously performed "using a pen and paper" have "repeatedly" been "found unpatentable"). As *Alice* itself put it, "adding the words 'apply it with a computer'" does not "transform a patent-ineligible abstract idea" into something patentable. 573 U.S. at 223; *see*

*also Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (collecting cases).

### 2. The '411 and '996 claims do not improve computer functioning.

TT cannot save its patents by "latch[ing] on to th[e] language from *Alice*" that distinguished claims that "improve the functioning of the computer itself." *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1362 (Fed. Cir. 2020). *Alice* itself contrasted claims that "improve[] computer technology" with "claims [that] simply recite the concept of [an economic practice] as performed by a generic computer." 573 U.S. at 225 (citation omitted). Accordingly, this Court is careful in assessing alleged "software innovations." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1293 (Fed. Cir. 2020). In such cases, the step one "inquiry often turns on whether the claims focus on specific asserted improvements in computer capabilities or instead on a process or system that qualifies [as] an abstract idea for which computers are invoked merely as a tool." *Id*. (citation omitted). TT's claims are the latter.

a. TT maintains that its claims recite two improvements: increasing speed and accuracy, and fixing the missing-the-price issue. Br. 37. As to the first, TT says its claims "provide[] visualization improvements" (Br. 44), which in turn improve "speed, accuracy, and usability" (Appx12). But as the district court recognized, this Court's binding *IBG* decisions make it "clear that the goal of providing market information in the specific configuration recited by the patents is to 'improv[e] the

trader, not the functioning of the computer.'" Appx12 (quoting *IBG III*, 921 F.3d at 1383). Claims that "improve computer functionality by improving on the intuitiveness and efficiency of prior GUI tools" and are designed to "help[] the trader process information more quickly" are "not an improvement to computer functionality"—and thus are "patent ineligible." *IBG II*, 921 F.3d at 1094.

The specification here explains that TT's claimed invention focuses not on improving the computer, but on providing a graphical software solution that "allows the *trader* to trade quickly and efficiently." Appx13; *see* Appx63631; Appx63644; Appx63646; Appx63656; Appx63669; Appx63671. Both asserted patents disclose "[a] method and system for reducing the time it takes for a *trader* to place a trade when electronically trading on an exchange." Appx12-13; *see also* Appx63631; Appx63644; Appx63656; Appx63669. But "improving a user's experience while using a computer application is not, without more, sufficient." *Customedia*, 951 F.3d at 1365. Even if a "claimed display purportedly 'assist[s] traders in processing information more quickly,'" that "purported improvement in user experience d[oes] not 'improve the functioning of the computer, make it operate more efficiently, or solve any technological problem.'" *Id*. (citing *IBG II*, 921 F.3d at 1092-93; *IBG III*, 921 F.3d at 1381, 1384-85).

This Court has repeatedly reiterated that principle in invalidating TT patents. For example, *IBG III* held that "'the focus of the claimed advance over the prior art'

is providing a trader with additional financial information to facilitate market trades, an abstract idea." 921 F.3d at 1384. "[T]he claims [there] fail[ed] because arranging information along an axis d[id] not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem," and thus were "directed to an abstract idea." *Id.* at 1385. Likewise, in an unpublished decision involving related TT patent claims—which TT has described as having "no meaningful difference[s]" from the '411 or '996 claims (Br. 38)—this Court invoked its "two precedential decisions" in holding that the patent claims "focus[ed] on improving the trader, not the functioning of the computer," and thus were invalid. *IBG IV*, 767 F. App'x at 1007. As the district court held, "[b]ecause the claims of both patents [here] 'are focused on providing information to traders in a way that helps them process information more quickly, not on improving computers or technology,' they are directed towards the abstract idea of placing orders on an electronic exchange." Appx13 (quoting *IBG III*, 921 F.3d at 1383).

b. TT's second asserted computer improvement is fixing the "technical problem where a trader misses his 'intended price'" (Br. 30), which arises when the market moves just before the user clicks on her mouse. Br. 30. But neither asserted patent fixes that problem. The '411 and '996 claims "include price axes that automatically move" and thus fail to "solve the missing-the-price problem." Appx13 (citing *IBG LLC v. Trading Techs. Int'l, Inc.*, 2017 WL 4708078, *15 (P.T.A.B. Oct.

17, 2017), *aff'd*, *IBG IV*, 767 F. App'x at 1007). Under *IBG II*, a claim does not fix the missing-the-price problem if it "does not specify what happens immediately after the price changes" to keep the prices from moving. 921 F.3d at 1091, 1095.

TT's carefully crafted language confirms as much. No less than five times, TT says "the prices do not change positions *every time* there is a change in the market," or "the prices do not change positions *every time* the market changes," or "the prices do not change *every time* the market changes." Br. 9, 12, 43, 44 (emphases added). At one point, TT states: "the price axis is not moving *each and every time* the market changes." Br. 44 (emphasis added). But TT cannot deny that its claims encompass axes that *do* change automatically, leaving the "user [with] no way of knowing when" the prices will move. Br. 42. It "is not the frequency of automatic re-centering," but the possibility thereof, that matters. *See Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1356 (Fed. Cir. 2010). Courts "must detect the difference between a price axis that moves only in response to the trader's instruction and a price axis that adjusts itself without prompting." *Id.*

The asserted claims "recite steps of receiving and dynamically displaying market information along a price axis that is not required to remain static." Appx14. That is, those "claims [are] not limited to displays with 'static' price axes"; they are "broad enough to encompass some form of automatic recentering." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1319 (Fed. Cir. 2013)). Because

those claims do not "specify what happens immediately after the price changes" (*IBG II*, 921 F.3d at 1091)—unlike a static price axis, which "require[s] a manual recentering command" to move (*Open E Cry*, 728 F.3d at 1320)—they do not fix the missing-the-price issue (*IBG II*, 921 F.3d at 1094). Thus, as this Court has twice affirmed—in assessing other TT claims to non-static price axes in the same family as the asserted patents—TT's claims "do[] not solve any purported technological problem." *Id.* at 1091, 1094-95; *IBG IV*, 767 F. App'x at 1007-08 (relying on *IBG II* and *IBG III*, precedential decisions).

**3. This Court's nonprecedential decisions either involved static price axes, decided Covered Business Method eligibility rather than Section 101 eligibility, or both.**

TT offers no explanation of *how* its patent claims are not directed to an abstract concept. Instead, TT invokes two unpublished opinions that predate this Court's precedential Section 101 decisions invalidating similar TT claims "relat[ing] to displaying market information on a screen" (*IBG III*, 921 F.3d at 1381) and "graphing (or displaying) bids and offers to assist a trader to make an order" (*IBG II*, 921 F.3d at 1093). Astonishingly, TT never *mentions* the latter decisions.

That is likely because TT has no answer. In a recent oral argument before this Court on related patents, TT's counsel was asked: "Can you try to answer one of these questions without referring to one of those non-precedential opinions?" OA at 16:45-16:58 (Nos. 18-1105, 18-1302, 18-1438) (May 9, 2019). TT could not. Thirty

seconds later, the judge concluded: "Okay, I think we have your argument. I mean, you're back to arguing those non-precedential cases." *Id.* at 17:28.

In any event, TT's nonprecedential decisions involved distinct patents and issues. *CQG* involved TT's '304 and '132 patents—which claim a "static" price axis, and which the district court upheld. 675 F. App'x at 1003. But as the district court explained, *CQG* is not persuasive as to TT's patents "which 'd[o] not recite the static price axis feature.'" Appx13 (citation omitted). And *IBG I* did not even address Section 101. 757 F. App'x at 1008.

Moreover, TT's non-precedential cases have since repeatedly been questioned by this Court. In *IBG II*, for example, the Court stated: "TT argues that because non-precedential decisions of this court held that other TT patents were for technological inventions or claimed eligible subject matter, we should too. We are not bound by non-precedential decisions at all." 921 F.3d at 1095. Some members of the Court have even called those opinions "probably wrong and wrongly decided." OA 12:01 (Nos. 18-1105, 18-1302, 18-1438) (May 9, 2019). Regardless, TT's unpublished decisions are neither Section 101 cases nor binding. *IBG II*, 921 F.3d at 1095.[6]

---

[6] *See also* OA 33:51 (Nos. 17-2257, 17-2621, 18-1063) (Mar. 8, 2019) ("Even if they were right, which I doubt."); *id*. at 4:36, 4:56 ("we are not really supposed to be using nonprecedential opinions as precedent"); OA 2:17, 13:01 (Nos. 18-1105, 18-1302, 18-1438) (May 9, 2019) ("since then in two precedential decisions we've ruled a whole bunch of other of your claims to be ineligible under 101. And those precedential decisions are binding on us"); *id.* at 11:58 ("you continue to argue these non-precedential opinions … . They're irrelevant."); OA 4:35 (No. 18-1489)

### B. The district court correctly held that the ’411 and ’996 claim elements do not add an “inventive concept” under *Alice*’s second step.

Where, as here, patent claims are directed to a patent-ineligible concept, *Alice* then asks whether the claims “contain[] an inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application.” *Killian*, 45 F.4th at 1379 (citation omitted). Here, those elements, whether “alone” or “in combination, fail to add [that] ‘something more.’” *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (citations omitted).

The asserted claims recite steps of generic computers receiving market information, displaying it graphically along a price axis, and sending orders to an electronic exchange. Appx6-8. But “mere receipt of information is not innovative,” and “[d]isplaying and plotting information available to all is no more inventive.” Appx15 (citing *Elec. Power*, 830 F.3d at 1353). The claimed display may be “implemented on any existing or future terminal device,” with programing “done by any technique known to those skilled in the art.” Appx15. Thus, “the ‘tool for presentation’ here, is simply a generic computer” (*IBG III*, 921 F.3d at 1385 (citation omitted)), and using generic computers to collect, organize, and graphically display information is not inventive. *Alice*, 573 U.S. at 223-24.

(June 5, 2019) (“it seems to me you don’t have any choice but to agree with us that we’re bound by the two precedential opinions”).

Another element of TT's claims is that a user can enter an order with a single click. But as the district court recognized, "a one-click order entry region on a GUI already existed" in the prior art. Appx15. TT does not suggest that the claimed method of submitting user orders is innovative, and for good reason: "TT [has] acknowledged that conventional GUIs for electronic trading permitted a trader to send an order electronically." *IBG II*, 921 F.3d at 1094. Because none of the claim steps involve an "inventive concept that transforms the abstract idea of organizing and displaying visual information into a patent-eligible application of that abstract idea" (*Zillow*, 50 F.4th at 1383), the asserted claims are patent-ineligible.

### C. A host of this Court's other Section 101 decisions confirms that the district court correctly held TT's '411 and '996 patents patent-ineligible.

As explained above, this Court's precedential decisions involving TT's own patents—not TT's nonprecedential cases—govern this case and confirm that TT's claims are patent-ineligible. But if doubt remained, a wealth of this Court's precedents supports affirmance.

At step one, this Court has repeatedly held that claims "directed to collection of information, comprehending the meaning of that collected information, and indication of the results, all on a generic computer network operating in its normal, expected manner" are abstract. *Killian*, 45 F.4th at 1380. *Zillow*, for example, invalidated claims that "disclose[d] improvements to the field of [GUIs]," explaining that

"[i]dentifying, analyzing, and presenting certain data to a user is not an improvement specific to computing." 50 F.4th at 1378. *Zillow* cited *IBG II* as an example of an invalid "graphical user interface" claim that did "not improve the functioning of the computer," but simply "recite[d] a purportedly new arrangement of generic information that assists [users] in processing information more quickly." *Id.* at 1380 (quoting *IBG II*, 921 F.3d at 1093).

Other step one cases hold that "[a]utomation or digitization of a conventional method … on a computer does not bring the claims out of the realm of abstractness" (*Weisner v. Google LLC*, 51 F.4th 1073, 1083 (Fed. Cir. 2022)), and that "facilitat[ing] an economic transaction, for which computers are merely used in a conventional way," is not "a technological improvement to computer functionality itself" (*Universal Secure Registry LLC v. Apple Inc.*, 10 F.4th 1342, 1350 (Fed. Cir. 2021)). Still other cases stress that "functions [that] are mental processes that 'can be performed in the human mind' or 'using a pencil and paper'" are "telltale sign[s] of abstraction." *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) (citation omitted); *see Killian*, 45 F.4th at 1379 (collecting cases). In short, "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology," even if it "speed[s] up the process," and "a patent that automates pen and paper methodologies to conserve

human resources and minimize errors is a quintessential do it on a computer patent directed to an abstract idea." *Zillow*, 50 F.4th at 1378, 1382 (cleaned up).

This Court's recent step two cases likewise support affirmance. For instance, many hold that there is no inventive concept when claims "rely on the use of existing technology to create a computerized version … and do not 'focus on a specific means or method that improves the relevant technology.'" *Weisner*, 51 F.4th at 1083; *see PersonalWeb*, 8 F.4th at 1316; *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021) (citation omitted) ("Conventional computer equipment can be 'vital' to an advance that is still abstract, but not suffice to avoid ineligibility at *Alice* step two."); *Killian*, 45 F.4th at 1380. And *Zillow*, which involved purported improvements to a "graphical user interface," reaffirmed that reciting "claims to 'an abstract idea implemented on generic computer components, without providing a specific technical solution beyond simply using generic computer concepts in a conventional way,' do not suffice at step two." 50 F.4th at 1379 (citation omitted); *see also Killian*, 45 F.4th at 1380 (claims that simply "instruct the practitioner to perform the abstract steps of gathering information, determining if a person is receiving benefits or is eligible for benefits under the law, and displaying the results of that analysis, all on a generic computer" are not inventive); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240-43 (Fed. Cir. 2016). In sum, quite apart from this Court's published *IBG* decisions, precedent compels affirmance.

### D. Even if the ’411 and ’996 patents were valid and infringed, damages would be limited by the jury’s previous damages determination.

Even if this Court were to reverse the district court’s Section 101 ruling and remand, and even if a jury were to find the patents valid and infringed, any remand should be governed by the royalty rate already decided by the jury ($.10 per trade) and limited to uses of WebTrader, not BookTrader, as the jury already determined the appropriate royalty rate to be applied to any trades.

TT’s damages expert opined that “the reasonable royalty would be the same whether infringement is found for one or more than one of the Patents-in-Suit.” Appx94113. “[I]f the ’411 Patent and/or ’996 Patent were found to be invalid and/or not infringed,” she explained, “the royalty base and royalty rate would be” the same (Appx94113), although the uses of WebTrader would not be included in the base because WebTrader potentially infringed only the ’411 and ’996 patents. Yet the jury made a finding concerning the damages for uses of order entry tools that infringed one or more of TT’s patents: $.10 per use. And TT has repeatedly conceded that this number, times the number of trades, “formed the foundation of IB’s damages case,” which “the jury adopted.” Appx103483; *accord* Appx93243.

On similar facts, this Court has held that reversing an invalidity decision as to one of several patents does not require revisiting a jury’s damages decision where, as here, “any damages that would result from the alleged infringement of [one] patent also result[ed] from the infringement of” other tried patents. *Chrimar Holding*

*Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 886-87 (Fed. Cir. 2018). Here, TT presented evidence that the damages would not change whether one or four patents were infringed. The jury found that at least one TT patent was infringed, and determined the appropriate royalty for uses of the trading tool that infringed. TT cannot now argue that damages would be different.

## II. TT was fully allowed to pursue foreign damages theories at trial, the jury rejected them, and TT waived further consideration of the issue; but if the issue was preserved, TT's attempt to recover foreign damages is foreclosed by Section 271(a)'s plain text and *WesternGeco*.

If the Court finds that the issue is preserved, TT cannot stretch the heart of U.S. patent law beyond the water's edge. Unlike § 271(f)(2), which prohibits a domestic act intentionally directed overseas—namely, "the act of exporting" (*WesternGeco*, 138 S. Ct. at 2135)—the focus of § 271(a) is on making, using, or selling a patented invention "within the United States." Given that basic textual difference, letting TT recover foreign lost profits under § 271(a) would rewrite the statute, and *WesternGeco* fully supports this Court's decision in *Power Integrations*.

Yet this Court can affirm on several other independent grounds. For starters, TT was allowed to present two worldwide damages theories that involved the same underlying domestic conduct as its *WesternGeco* theory, but the jury rejected them, limiting the royalty base to U.S. users. Having presented evidence on IBG's foreign user base and their downloading and purchasing activities, TT cannot get a "do over" by recasting its "making" and "sale" theories as a theory involving the "foreseeable"

effects of domestic infringement. Moreover, before and during trial, TT conceded that it cannot recover for "use" of its software "by a customer outside of the United States." Appx103097; *accord* Appx86033; Appx19-20. And *after* trial, TT "abandoned" its *WesternGeco* theory—and thus "waived" it. Appx41 n.3; Appx44 n.5. We begin with these threshold issues, then address TT's theory on the merits.

### A. TT waived its *WesternGeco* foreign damages theory.

As the district court found, TT "waived" its theory that foreign damages are available under *WesternGeco* because it "abandoned this argument in its reply" below, and "[a]rguments abandoned in a reply brief are generally deemed waived." Appx41 n.3; Appx44 n.5 (citing Dkt. 2228). That holding is compelled by numerous Seventh Circuit decisions.

In *United States v. Farris*, for example, the Seventh Circuit held that the defendant forfeited his argument by "fail[ing] to respond to the Government's argument in a Reply Brief" in the district court. 532 F.3d 615, 619 (7th Cir. 2008). Similarly, in *Blair v. Graham Correctional Center*, that court held that the plaintiff "abandoned [an] argument" by "not respond[ing]" to it "in his reply brief." 1993 WL 331886, at *3 (7th Cir. Sept. 1, 1993). District courts in the Seventh Circuit have reached the same conclusion. As one district court explained in a case where the plaintiff "d[id] not further discuss [an issue] or respond to the [Defendant's] arguments in her reply brief": "Courts in this circuit construe such an omission as an

abandonment of the argument." *E.g.*, *Debra B. v. Kijakazi*, 2022 WL 1541335, *5 (N.D. Ill. May 16, 2022); *Nordstrom Consulting, Inc. v. Innova Sys., Inc.*, 2022 WL 16744177, *5 (N.D. Ill. Nov. 4, 2022) ("Defendants do not address Plaintiffs' arguments as to prejudice in their Reply, and therefore have waived any response."); *Brunner v. Jimmy John's LLC*, 2015 WL 13653079, *4 (N.D. Ill. Dec. 11, 2015) ("Plaintiffs' reply fails to address this argument … thereby conceding [it]").

That is precisely the situation here. TT raised its *WesternGeco* theory in its opening post-trial brief; but after IBG explained why TT's argument was unpersuasive, TT entirely dropped it. Appx41 n.3; Appx44 n.5. Consistent with the foregoing decisions, the district court rightly held that TT waived the theory. And "an argument that has been waived is unreviewable on appeal." *United States v. Murdock*, 491 F.3d 694, 698 (7th Cir. 2007).

**B. TT was permitted to fully pursue its claim for foreign damages.**

Setting aside TT's post-trial waiver (which independently disposes of TT's *WesternGeco* appeal), TT protests that it was barred from seeking "worldwide damages" that were "the foreseeable and but-for result of infringement in the United States." Appx19 (quoting Appx94549 ¶ 765); *see also* Br. 48. In reality, however, TT was allowed to present two foreign damages theories: (1) that when foreign IBG customers downloaded BookTrader, IBG's systems "*ma*[*de*] *a copy* of the accused products via a server located in the United States"; and (2) that IBG *sold* that

software when users signed customer agreements. Appx18-19 (emphasis added).[7] Citing *WesternGeco*, TT cast its *third* foreign damages theory as seeking "the foreseeable and but-for result of infringement in the United States" (Appx19), to make it sound like something different. But that theory was likewise based on IBG making BookTrader and foreign users downloading BookTrader from the U.S. Appx94549-52. In short, there was no difference between the theory that TT says it was barred from presenting and the theories it actually presented.

Specifically, the district court allowed TT to present evidence that acts of "foreign users downloading TWS [] from U.S.-based servers and entering a Customer Agreement as part of the download process" occurred "within the United States," even if the customer was overseas. *E.g.*, Appx99879-80; Appx99999-100008; Appx100011-14; Appx100890-98; Appx101026; Appx10164-65. Moreover, Lawton's royalty calculation under TT's "making" and "sale" theories included everyone on the planet who "made at least one trade" during the damages period (Appx100895; *see* Appx100891-92 (the base includes both "a US CCP user month, Europe/Asia CCP user month")), and each theory produced identical royalties (Appx100901-04). As a result, TT's claimed foreign damages based on its "making"

[7] Appx100602-100604 (evidence of copying), Appx99999-100008 (downloading and sale evidence, including by foreign users), Appx100775, Appx100891-100897 (evidence of domestic use).

and "sale" theories were the same—reasonable royalties defined as "a $50 per user per month minimum" (Appx94527; Appx94534), multiplied by "every TWS active user that did even one trade in a month" (Appx100940).

TT's *WesternGeco* theory rests on the same alleged underlying conduct: foreign customers receiving TWS outside the United States and then using it, with a royalty based on the identical $50 per user per month for actual use of TWS abroad. Appx94549-52. So what was TT prevented from presenting to the jury? *Nothing*. It complains that it was somehow constrained, yet TT has not identified a single fact, document, argument, or damages figure that it would have presented beyond those it actually presented. In reality, TT was allowed to present all its evidence about downloads and customer agreements at trial, but the jury rejected TT's foreign damages theories. *Compare* Appx93222-27 (verdict form) (awarding $6,610,985 in damages) *with* Appx102578-79 (Reed) (explaining that a $0.10 per-trade royalty limited to U.S. residents produced $6,610,985 in damages).

Absent any theory that TT was substantively precluded from pursuing at trial, any suggestion that TT was prejudiced by the district court's *WesternGeco* ruling is untenable. And that is even clearer in light of Lawton's admission—both "at her deposition" (Appx19-20) and at trial—that TT cannot recover for "use" of its software "by a customer outside of the United States." Appx103097; Appx86033. In short, even if its *WesternGeco* theory were correct (a point we refute below), any

error was harmless, and not a basis for reversal. *E.g.*, *Downing*, 48 F.4th at 808 ("no harmless-error analysis is necessary" where excluded evidence was cumulative); *Blameuser*, 345 App'x at 186 (error harmless where excluded expert opinions were admitted into evidence by other means).

### C. TT cannot circumvent Section 271(a)'s territorial limitation.

Finally, TT's *WesternGeco* theory is unconvincing on the merits. As the Supreme Court has held "time and again," one "cardinal canon" comes "before all others"—"courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) (collecting authorities). Moreover, "[w]hen the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id*. at 254 (citation omitted). TT never grapples with this principle.

The provision that TT invokes—Section 271(a) of the Patent Act—contains an express territorial limitation: it focuses on making, using, selling, or offering to sell a patented invention "within the United States" or "import[ing]" a patented invention "into" the country. This case does not involve imports, and one searches § 271(a) in vain for a prohibition on conduct that is directed overseas. Reading this statute—which says nothing about such conduct and indeed contains an express territorial limitation on what is prohibited—to authorize foreign damages would thus rewrite it. Even assuming TT was properly allowed to present Lawton's "making"

and "sale" theories, which involve foreign users, that leaves only foreign "use," and TT cannot plausibly say that foreign use occurred "within the United States," or that "overseas [uses] were merely incidental to the infringement." *WesternGeco*, 138 S. Ct. at 2138.[8] To so hold would do an end run on § 271(a)'s territorial restriction.

The contrast between § 271(a) and § 271(f)(2), at issue in *WesternGeco*, powerfully confirms that the Court should affirm. As the Supreme Court there explained, the second step of the Court's "extraterritoriality framework" asks "'whether the case involves a domestic application of the statute'" by identifying the "focus" of the statute "and asking whether the conduct relevant to that focus occurred in United States territory." 138 S. Ct. at 2136 (citation omitted). *WesternGeco* involved both § 284, which authorizes "damages adequate to compensate for the infringement," and § 271(f)(2), which prohibits supplying a component specifically adapted for a patented invention "in *or from* the United States," if one "know[s]" and "intend[s] that such component will be combined *outside of the United States*" to infringe. (Emphasis added). The "focus" of § 284, the Court stated, is "'the infringement'" barred by § 271, and the "focus" of § 271(f)(2) is "the domestic act of 'suppl[ying]

[8] Below, IBG challenged foreign sales and users as beyond §271(a), but the district court allowed TT to present such evidence. Appx19. Because the jury rejected TT's arguments that foreign users should be included in the royalty base, this Court need not take up that issue. But even assuming, *arguendo*, that TT's royalty base properly included foreign users who downloaded or purchased the accused software, § 271(a) does not reach further, to alleged foreign exploitation of the accused software.

in or from the United States.'" *Id*. at 2137, 2138. Taken together, therefore, the combined "focus" of § 271(f)(2) and § 284 was "on the act of *exporting components from* the United States." 138 S. Ct. at 2138 (emphasis added). And the fact that § 271(f)(2) "addresses the act of exporting" made it reasonable to conclude that Congress authorized "recover[y] for lost foreign profits." *Id*. at 2135, 2139.

As the district court explained, "infringement under § 271(f), unlike infringement under § 271(a), explicitly contemplates limited foreign activities that are actionable in the United States." Appx45. And this becomes even clearer when § 271(a) is read, not "in a vacuum," but "in concert with" other sections of the Patent Act. *WesternGeco*, 138 S. Ct. at 2127. For example, beyond the contrast with § 271(f)(2), § 154(a)(1) of the Act parallels § 271(a) in granting a patent owner "the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States." 35 U.S.C. § 154(a)(1). Full stop.

TT nonetheless tries to make an asset of the fact that "the 'express language' of Section 271(a) applies only to conduct within the United States." Br. 49 (citation omitted). Noting that § 271(f)(2) proscribes supplying infringing components *from* the United States, a domestic act, TT says that § 271(f)(2) is "just like" 271(a), that the statutes regulate "analogous" conduct, and that "*WesternGeco* applies equally" here. Br. 51, 49. But that argument stretches both *WesternGeco* and § 271(a)'s text beyond the breaking point.

The Court in *WesternGeco* was analyzing whether, under the second step of its extraterritoriality framework, foreign damages were available apart from whether § 271(f)(2) overcame the "presumption against extraterritoriality"—a question with much broader foreign policy implications. 138 S. Ct. at 2138. That required asking whether the conduct prohibited by § 271(f)(2) was "domestic infringement." *Id*. But the Court did not authorize foreseeable foreign damages under § 284 regardless of "the *type* of infringement that occurred." *Id*. (emphasis added); *see also id*. at 2137 (observing that § 284's focus on "'the infringement'" "does not fully resolve this case, as the Patent Act identifies several ways that a patent can be infringed. See § 271."). Had it taken that approach, which WesternGeco advocated, analyzing the "focus" of § 271(f)(2) would have been superfluous. *Id.* at 2136 ("WesternGeco argues that the presumption against extraterritoriality should never apply to statutes, such as §284, that merely provide a general damages remedy for conduct that Congress has declared unlawful."). Rather, the Court focused on the distinct text and purposes of the specific § 271 subsection at issue, holding that foreign damages were available because the focus of "infringement under § 271(f)(2)" was "on the act of exporting components." *Id*. at 2138.

The enactment history of § 271(f) further supports this reading. That section narrowly amended § 271 to close a specific loophole. In *Deepsouth Packing Co. v. Laitram Corp*., the Supreme Court held that a domestic manufacturer who made the

components of an infringing product, and then exported them for assembly abroad, did not violate § 271(a) because the plaintiff (Laitram) could not show "§ 271(a) direct infringement … in the United States"—"that Deepsouth 'makes,' 'uses,' or 'sells' the patented product within the bounds of this country." 406 U.S. 518, 527 (1972); *see also id*. at 523 ("Section 154 and related provisions obviously are intended to grant a patentee a monopoly only over the United States market," not "to grant a patentee the bonus of a favored position as a flagship company free of American competition in international commerce."). "In response, Congress enacted § 271(f), which overruled *Deepsouth* to impose liability on domestic entities shipping components abroad (with the requisite intent)." *WesternGeco LLC v. Ion Geophysical Corp.*, 791 F.3d 1340, 1350 (Fed. Cir. 2015). But Congress went no further—it did not amend § 271 to say that foreign sales or uses of a patented invention made in the United States were covered—the only acts directed overseas in § 271 are those in § 271(f), which "addresses the act of exporting." *WesternGeco*, 138 S. Ct. at 2135.

In sum, that the conduct and statute in *WesternGeco* had a domestic focus was a necessary, but not sufficient, condition for reaching foreign damages, and the courts may not ignore § 271(a)'s express territorial limitation.[9] And since TT's

[9] None of TT's district court decisions grapples with the stark textual differences between § 271(a) and § 271(f). *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2018 WL 4804685, *1 (D. Del. Oct. 4, 2018); *Plastronics Socket*

misreading of *WesternGeco* is its only argument for reversal, it is evident that this Court's decision in *Power Integrations* remains controlling. Calling it "axiomatic" that the U.S. patent laws "do not … provide compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all," the Court there rejected the notion that a patentee "may recover damages for … worldwide sales of the patented invention because those foreign sales were the direct, foreseeable result of [the defendant's] domestic infringement." 711 F.3d at 1371. "[The] principle of 'full compensation'" in patent damages law has "geographical limits." *Id*. at 1370.[10]

---

*Partners, Ltd. v. Dong Weon Hwang*, 2019 WL 4392525, *4-5 (E.D. Tex. June 11, 2019); *W.H. Wall Fam. Holdings LLLP v. CeloNova Biosciences, Inc.*, 2020 WL 1644003, *3 (W.D. Tex. Apr. 2, 2020); *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 396 F. Supp. 3d 323, 351 (S.D.N.Y. 2019); *ABS Glob., Inc. v. Inguran, LLC*, 2020 WL 2405380, *8-9 (W.D. Wis. May 12, 2020).

[10] If this Court were to agree with TT's reading of *WesternGeco*, any remand would properly be limited to determining the size of the royalty base (the number of infringing foreign traders and trades), not the per-trade damages. As noted (at Appx93222-27), the jury rejected TT's proposed royalty, and TT does not challenge the jury's determination of a $0.10 per trade royalty, only the size of the royalty base. Thus, TT would not get a "do over" on its entire damages case. *Mitutoyo Corp. v. Cent. Purchasing, LLC*, 499 F.3d 1284, 1292 (Fed. Cir. 2007) (for errors affecting the size of the royalty base, the remedy is a "remand for a proper accounting of the base"); *see also Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1374 (Fed. Cir. 2008) ("[W]e affirm the district court's assessment of a 7% reasonable royalty rate. Because Mars's lack of standing for the period from 1996 to 2003 changes the royalty base, we must remand for recalculation of damages using the 7% rate."); *Rite-Hite Corp. v. Kelly Co.*, 56 F.3d 1538, 1555-56 (Fed. Cir. 1995) ("[W]e affirm the trial court's calculation of a reasonable royalty rate," but "remand for a redetermination of damages based only on the sale of the infringing restraints and not on the restraint-leveler packages."); *Paymaster Techs., Inc. v. United States*, 180 Fed. Appx942, Appx949 (Fed. Cir. 2006) (similar).

## III. The district court did not abuse its discretion in denying TT's Rule 60(b) motion for a new trial based on frivolous allegations of fraud.

In a last-gasp effort to avoid affirmance, TT asks this Court to reverse the district court's denial of its motion for a new trial on damages based on eleventh-hour allegations of "fraud." Br. 52-66. The Court should affirm.

The Seventh Circuit's "'extremely deferential abuse of discretion standard'" for Rule 60(b) rulings "is met 'only when no reasonable person could agree with the decision to deny relief.'" *Texas*, 37 F.4th at 1344 (citation omitted). TT cannot satisfy that demanding standard here. Indeed, TT barely mentions it. Br. 33.

According to TT, the district court made "two critical errors" in denying its motion: first, that TT itself was at fault for failing to "question and investigate" how IBG tracked BookTrader orders during pre-trial discovery (Br. 59); and second, that it ultimately did not matter whether IBG "tracks orders by origination tool rather than order entry tool" (Appx40), because for BookTrader "the originating tool and the submitting tool are necessarily the same tool" (Br. 61). As explained below, the district court did not err, let alone in a manner that "no reasonable person could agree with." *Texas*, 37 F.4th at 1344.

### A. Brumfield has changed arguments on appeal.

As an initial matter, it is illuminating that TT's arguments for a new trial have been evolving since it filed its post-trial motion below. TT's original motion argued, through the declaration of Brumfeld, then its majority owner, that IBG had engaged

in discovery misconduct by "not mak[ing] TT aware of the [hot key framework for tracking trades] until near the very end of trial." Appx93233. Brumfield also accused IB's trial witnesses of lying (Appx93241) and purported to describe an intricate system of "independently launching," "parent," "children," and "grandchildren" trading tools that IBG was supposedly using to track its trades. Appx94665.

After IBG explained why TT's accusations were unfounded, TT's reply all but dropped the "hot key framework" argument. Instead, through yet another Brumfield declaration, TT pressed a theory that appeared nowhere in TT's opening brief—that IBG had "always led Plaintiff to believe that it was tracking orders and trades in TWS by what tools the orders are *submitted* from," when IBG actually was tracking orders based on "the order originators." Appx103487 (emphasis added). Moreover, Brumfield's second declaration disavowed the "launching" method of tracking trades he earlier advanced and concocted an entirely new theory for how IBG was tracking trades. Appx103652-53.

TT's argument has morphed again. Nowhere does TT now allege discovery misconduct or perjury, or press its "hot key framework" allegations. Instead, TT advances only Brumfield's claim from his second declaration (Appx103496)—that IBG "has always" represented that it was "tracking orders and trades in TWS by what tools the orders are submitted from" but was not actually doing so.

TT's understandably forgoes most of its earlier fraud claims. In rejecting TT's post-trial motion, the district court credited IBG's witness, holding that Brumfield "fail[ed] to demonstrate that IB presented false testimony." Appx39; Appx41. That "determination[] of witness credibility 'can virtually never be clear error'" (*United States v. Biggs*, 491 F.3d 616, 621 (7th Cir. 2007) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985))—even when a district court determines the credibility of an affidavit or compares it to trial testimony. *See United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018). The district court—which shepherded this case for eleven years and presided over a month-long trial—also held that there was at best conflicting expert testimony over whether IBG had failed to produce the "hot key framework" code, which could not satisfy the clear-and-convincing evidence standard. Appx38. Not surprisingly, TT now abandons these spurious claims.

### B. The district court did not abuse its discretion in denying TT's Rule 60(b) motion based on TT's own failures to inquire and investigate the facts and data it was provided in discovery long before trial.

Instead, TT says it was never informed how IBG tagged trades made through Booktrader. But as the district court ruled—correctly, and certainly not unreasonably—"TT fail[ed] to demonstrate by clear and convincing evidence" that IBG's conduct, "as opposed to [TT's] own failure to ferret out information during discovery, prevented it from fully and fairly litigating its case." Appx37. And because "Rule 60(b) motions cannot be used to present evidence that with due diligence could have

been introduced before judgment," Rule 60(b)(3) relief are properly denied where, as here, the moving party could have made the same arguments before final judgment. *Rutledge v. United States*, 230 F.3d 1041, 1052 (7th Cir. 2000).

As the district court explained, "[a]ll of the materials Brumfield relied on" after trial to allege fraud "were produced prior to trial and admitted into evidence." Appx36. Thus, "TT had means prior to trial to discover that IB may not in fact track orders by order entry tool and it could have crossed IB's witnesses about this at trial." Appx36.

For example, TT makes much of the "Accumulate/Distribute" data. *E.g.*, Br. 60. But TT "knew of Accumulate/Distribute prior to trial," and "had access to the referenced stat reports prior to trial." Appx37. To boot, TT had deposition testimony that Accumulate/Distribute was IB's most important tool. Appx101171. TT easily could have compared the stat reports to that statement pre-trial "and reach[ed] the same conclusion [Brumfield] reache[d] post-trial." Appx37. Thus, the district court did not abuse its discretion in holding that TT failed to "present clear and convincing evidence that" any misunderstanding about how tools were tracked "was the result of IB's misconduct, rather than [TT's] own failure to ask adequate questions during discovery," to thoroughly investigate, and to effectively cross examine witnesses. Appx36.

TT offers three unconvincing attacks on the district court's reasoning. First, TT says it could not have been expected to investigate how IBG tracked the trades any more than it did during discovery because it considered tracking trades via submission "only logical and a given." Br. 59. But IBG is not responsible for TT's unfounded assumptions or failures to think through other plausible views of the evidence—especially when Brumfield admits that tracking orders and trades as he now speculates IBG tracked them "is legitimate business intelligence." Appx103499.

Second, TT says the district court erred in stating that (i) Brumfield "had access to the 'discovery stats reports' and 'Mr. Peterffy's deposition testimony regarding Accumulate/Distribute' prior to trial"; and (ii) IBG had identified the 38 order entry tools. Br. 60. TT's first argument is a straw man, and its second is just factually wrong, and certainly not an instance of clear error—the governing standard. *Shakman v. Clerk of Cook Cnty.*, 994 F.3d 832, 840 (7th Cir. 2021) (citing Fed. R. Civ. P. 52(a)(6)).

As to the first statement, regardless of whether the protective order permitted Brumfield, a fact witness, to view IBG's stat reports and the deposition testimony of IBG fact witness Peterffy before trial, it is undisputed that IBG turned over these materials *to TT* well before trial—leaving TT free to use them. TT did just that, using Peterffy's deposition testimony in cross-examining him and the stats reports in examining its coding expert. Appx101171; Appx100609-13; Appx100910-11;

Appx103003-04. And if TT believed that the protective order was unfairly inhibiting its trial preparation by limiting what Brumfield could review, TT should have moved to modify it. But TT did not seek *any* form of relief below, or otherwise raise Brumfield's need to review the materials. That alone bars TT's appeal. *Moseley, Hallgarten, Estabrook & Weeden, Inc. v. Ellis*, 849 F.2d 264, 271 (7th Cir. 1988) ("[I]t is axiomatic that arguments not raised below are waived on appeal.").

As to the 38 order entry tools that IBG allegedly did not disclose before trial, those were identified in the stats reports that, as Brumfield himself admits (Br. 25-26), IBG turned over during discovery.

Finally, TT maintains that the district court erred in finding that TT "failed to analyze the Blotter code to determine potential discrepancies" before trial, and that TT failed to analyze the Accumulate/Distribute numbers before IB's board chairman and founder testified. Br. 60-62. But in TT's own words, it "questioned Mr. Stetsenko at trial for nearly thirteen minutes" about the Blotter code. Br. 60. TT's own argument thus shows that it was not prejudiced in connection with the Blotter code.

TT offers an equally self-defeating argument in challenging the district court's finding that it failed to analyze the Accumulate/Distribute numbers. TT acknowledges that it analyzed those data, but made the strategic choice not to raise any perceived discrepancies at trial, as that might "unnecessarily elevate Accumulate/Distribute and diminish BookTrader in front of the jury." Br. 63; *see also* Br. 64 ("We

ultimately decided that was not a good idea."). Here too, therefore, TT itself confirms that the district court was correct to conclude that TT had the opportunity to make its case. A litigant cannot "try[] to relitigate the merits through Rule 60(b)." *Bell v. McAdory*, 820 F.3d 880, 883 (7th Cir. 2016) (citations omitted); *see Pearson v. Target Corp.*, 893 F.3d 980, 985 (7th Cir. 2018) ("[U]sually a strategic decision is enough to support the denial of a Rule 60(b)(1) motion.").

### C. The district court did not clearly err in finding that, for orders placed through BookTrader, the origination tool and order entry tool are the same.

TT's final argument is that the district court erred in finding that, for orders placed through BookTrader, "the originating tool and submitting tool are necessarily the same tool." Br. 61. But this argument does not begin to create "a definite and firm conviction that a mistake has been made"—a "high threshold." *United States v. Huskisson*, 926 F.3d 369, 376 (7th Cir. 2019). Indeed, the court's finding not only credited IBG's Stetsenko, but rested on Brumfield's own declaration. Stetsenko explained that "all of the tools [Brumfield] says are 'non-order entry' tools are used by users to place orders." Appx98646. He clarified that the TWS tools fell into "two categories: (a) those that are self-contained (i.e., they have their own order entry mechanism); and (b) those that are intended for order placement but do not have their own graphical order entry mechanism and thus use another IB tool for that purpose." *Id*. Stetsenko continued: "[f]or the first category, the mechanism of order

entry is straightforward; a user simply clicks to place an order or uses the keyboard to input an order from that tool. BookTrader belongs to this first category." *Id.*

Brumfield's second declaration agrees with Stetsenko that "category one" encompassed "self-contained" tools with "their own order entry mechanism" (Appx103496), and that BookTrader belongs in that category (Appx98646). Brumfield further agrees that a "tool can both originate and submit an order, which *is the case for tools in category one*." Appx103496 (emphasis added); Appx98647. Thus, the district court was correct that "any distinction between origination and order entry tools does not impact BookTrader trades," and that TT "cannot establish by clear and convincing evidence that IB presented false trial testimony." Appx40.

In a last-ditch effort to avoid the clear import of Brumfield's own declaration, TT says the "operative word in Mr. Brumfield's statement is 'can,'" and thus that even for first category orders, the originating and submitting tools can somehow be different. Br. 60-62. Nonsense. The important phrase in that sentence is "is the case for"—because when Brumfield says a "tool can both originate and submit an order, which is the case for tools in category one" (Appx103496), that means that what *can* be true of some tools *is* true for all tools in category one. And the district court certainly did not make a clear error in so concluding.

In the end, TT's argument boils down to unfounded factual disputes, presented without regard to the proper standard of review; an acknowledgement that TT had,

but chose not to use, certain data; and speculation drawn from Brumfield's own self-serving declaration. That falls exceedingly short of satisfying the demanding abuse-of-discretion standard that governs this issue.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.


*<u>/s/ Steffen N. Johnson</u>*

MICHAEL S. SOMMER
*Wilson Sonsini*
*Goodrich & Rosati, PC*
*1301 Avenue of the Americas*
*New York, NY 10019*
*(212) 999-5800*

MICHAEL B. LEVIN
*Wilson Sonsini*
*Goodrich & Rosati, PC*
*650 Page Mill Road*
*Palo Alto, CA 94304*
*(650) 493-9300*

NAOYA SON
*Wilson Sonsini*
*Goodrich & Rosati, PC*
*633 West Fifth Street*
*Los Angeles, CA 90071*
*(323) 210-2900*

STEFFEN N. JOHNSON
KELSEY J. CURTIS
*Wilson Sonsini*
*Goodrich & Rosati, PC*
*1700 K Street, N.W.*
*Washington, DC 20006*
*(202) 973-8000*
*sjohnson@wsgr.com*

NATALIE J. MORGAN
GRANVILLE C. KAUFMAN
*Wilson Sonsini*
*Goodrich & Rosati, PC*
*12235 El Camino Real*
*San Diego, CA 92130*
*(858) 350-2300*

*Counsel for Defendants-Appellees IBG LLC and Interactive Brokers LLC*


DATED: NOVEMBER 18, 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32 because it contains 13933 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14 point Times New Roman font.

DATED: NOVEMBER 18, 2022

*/s/ Steffen N. Johnson*
*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

I certify that today I caused this document to be filed electronically with the Clerk of Court using the CM/ECF system, and thereby served via CM/ECF on all parties and counsel of record.

DATED: NOVEMBER 18, 2022

*<u>/s/ Steffen N. Johnson</u>*
*Counsel for Defendants-Appellees*